UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FEI LONG ZHANG,

                Plaintiff,

    -against-

JOAQUIN ALVARADO and SANDRA E.
ALVARADO,

                Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**

15-CV-4373 (NGG) (JO)

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Fei Long Zhang brings this action for damages based on injuries he allegedly sustained in a February 2015 automobile accident. Plaintiff alleges that he suffered "serious injuries" within the meaning of New York's "No-Fault" Insurance Law when his vehicle was impacted by a car owned by Defendant Sandra E. Alvarado and operated by Defendant Joaquin Alvarado. (Compl. (Dkt. 6).)

Before the court is Defendants' motion for summary judgment (the "Motion"). (Defs. Mot. for Summ. J. ("Mot.") (Dkt. 26-1).) For the following reasons, the Motion is DENIED.

I.     **BACKGROUND**

The facts in this opinion are drawn from Defendants' statement of undisputed facts, submitted pursuant to Local Rule 56.1, as well as from exhibits and sworn statements submitted by both Defendants and Plaintiff in connection with their briefs in support of and in opposition to the Motion. (Defs. Rule 56.1 Statement ("Defs. 56.1") (Dkt. 26-2); Ex. C to Mot. ("Pl. 1st Dep.") (Dkt. 26-6); Ex. D to Mot. ("Pl. 2d Dep.") (Dkt. 26-7); Ex. E to Mot. ("Ellis Hosp. Records") (Dkt. 26-8); Ex. F to Mot. ("Mun Initial Report") (Dkt. 26-9); Ex. G to Mot. ("MRI Reports") (Dkt. 26-10); Ex. I to Mot. ("Wu Records") (Dkt. 26-12); Ex. J to Mot. ("IME

1

Report") (Dkt. 26-13); Ex. A to Pl. Opp'n to Mot. ("Mun Aff.") (Dkt. 26-15); Ex. B to Pl. Opp'n to Mot. ("Kaisman Aff.") (Dkt. 26-16); Ex. C to Pl. Opp'n to Mot. ("Pl. Aff.") (Dkt. 26-17).)[1]

A.  **The Collision**

At issue in the case is a car accident and Plaintiff's injuries resulting from that accident. On February 13, 2015, Plaintiff and Defendant Joaquin Alvarado were involved in an automobile accident (the "Collision"). (Defs. 56.1 ¶ 1; Pl. Aff. ¶ 1.) Defendant Sandra Alvarado owned the vehicle operated by Joaquin Alvarado at the time of the collision. (Defs. 56.1 ¶ 1.) Plaintiffs' car was impacted on the driver's side of the vehicle. (Id. ¶ 3; Pl. 1st Dep. 47:11-14.)

In his deposition testimony, Plaintiff alternately testified that the impact caused him to hit his head and knees on the interior of the car and, in a later deposition, that he did not come into contact with the inside of the car during the crash. (Compare Pl. 1st Dep. 67:25-69-20, with Pl. 2d Dep. 16:2-6.) Plaintiff states that he lost consciousness following the collision (see, e.g., Pl. 1st Dep. 56:12-20), though this claim appears to be contradicted by medical records prepared shortly thereafter (Mun Initial Report at ECF p.3.)

Plaintiff testified that, prior to the Collision, he had never sustained any injury to his neck, back, knee, or shoulder. (Pl. 2d Dep. 12:25-14:16.)

---

[1] Pursuant to Local Rule 56.1(a), Defendants submitted a statement setting forth the material facts as to which Defendants contend there is no genuine issue to be tried. (Defs. 56.1.) Plaintiff failed to respond with a counterstatement of disputed facts pursuant to Local Rule 56.1(b), but did attach several exhibits, including an affidavit by Plaintiff. (Ex. C to Pl. Opp'n to Mot. ("Pl. Aff.") (Dkt. 26-17).) Facts presented in a moving parties' statement of undisputed facts and not specifically controverted by a counter-statement may be deemed admitted. Local R. 56.1(c). However, the court is also permitted to "conduct an assiduous review of the record, even where one of the parties has failed to file such a statement." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks and citation omitted). The court has conducted such a review here, examining the exhibits submitted by the parties as well as the statements made in Defendants' 56.1 Statement and Plaintiff's affidavit in opposition to the Motion. With respect to Plaintiff's affidavit, however, the court is mindful that Plaintiff cannot "create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts [his] previous deposition testimony. See Clayborne v. OCE Bus. Servs., 381 F. App'x 32, 35 (2d Cir. 2010) (summary order) (quoting Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)). Accordingly, with respect to Plaintiff's affidavit in particular, the court cites only those statements that are not inconsistent with his depositions taken in this case.

2

### B. Plaintiff's Post-Collision Medical Records and Treatment

#### 1. Treatment at Ellis Hospital

Plaintiff was transported by ambulance from the site of the Collision to Ellis Hospital. (Defs. 56.1 ¶¶ 6, 8; Pl. Aff. ¶ 2; Pl. 1st Dep. 65:6-11.) Plaintiff testified that, at the time the ambulance arrived, he either did not or could not identify the parts of his body that were in pain. (Defs. 56.1 ¶ 6; Pl. 2d Dep. 18:4-7.)

Upon arrival, Plaintiff stated that he was experiencing pain in his right foot and knee (Defs. 56.1 ¶ 7; Pl. Aff. ¶ 2; Pl. 2d Dep. 19:17-20:7) and suffering from dizziness, a headache, and neck pain (Ellis Hosp. Records at ECF pp.1, 3). Physical examination of Plaintiff's neck and back were normal, as was a neurological examination. (Id. at ECF pp.4-5.) Hospital staff conducted a computerized tomography ("CT") scan of Plaintiff's head and x-rayed both his right knee and cervical spine, all of which returned normal results. (Id. at ECF pp.2, 6, 8-12.)

Plaintiff was discharged from the hospital just after midnight on February 14, 2015. (Id. at ECF p.7; Pl. Aff. ¶ 2.) When he was released, Plaintiff was not provided with a neck or back brace, walking aid, or prescription for any medication. (Defs. 56.1 ¶ 9; Pl. 2d Dep. 21:22-22:8.)

#### 2. Treatment by Dr. David Mun

Eleven days after the Collision, on February 24, 2015, Plaintiff sought treatment related to injuries sustained in the Collision from Dr. David Mun ("Mun"). (Defs. 56.1 ¶ 12; Pl. Aff. ¶ 3; see generally Mun Initial Report.) During this visit, Plaintiff complained of headaches, dizziness, nausea, pain in his neck, right knee, left wrist, and lower back, and "stiffness and muscle spasms radiating into [his] right hip." (Mun Initial Report at ECF p.1.) Plaintiff reported that the pain was "aggravated by walking" and that he was experiencing "difficulty with

3

activities of daily living including standing, sitting, walking, going up and down stairs, bending, lifting, and carrying." (Id.)

During the visit, Mun examined Plaintiff's cervical spine. He observed that Plaintiff had paravertebral muscular spasm and demonstrated tenderness to palpation. (Id. at ECF p.3.) A Cervical Compression Test was positive on Plaintiff's left side, while Hyperabduction and Adson Tests were negative on both sides. (Id.) Mun noted that Plaintiff's range of motion was between 12.5% and 40% below the normal range. (Id.)

As with Plaintiff's cervical spine, Mun noted that Plaintiff's thoracolumbar spine had a paravertebral muscular spasm and tenderness to palpation. (Id.) A Straight Leg Test was positive on Plaintiff's left side at 60 degrees and his right side at 70 degrees, and Plaintiff's range of motion was between 22.2% and 33.3% below normal. (Id. at ECF pp.3-4.)

Mun diagnosed Plaintiff with post-traumatic sprains in his cervical and lumbar spine, strain syndrome, lumbar myofascial pain syndrome, right knee derangement, and a right knee sprain (Mun Aff. ¶ 3), all of which he attributed to the Collision (Mun Initial Report at ECF pp.4-5). Mun recommended that Plaintiff undergo a course of treatment consisting of acupuncture treatments, physical therapy three times per week, possible "trigger point injection," stretching at home, and modification of activities. (Id. at ECF p.4.) He also limited Plaintiff's physical activities "such as lifting, carrying, bending, pulling, prolonged periods of standing [] or sitting, [and] climbing stairs." (Id. at ECF p.5.)

Beginning with this visit to Mun, Plaintiff received chiropractic treatment, physical therapy, and acupuncture approximately three-to-five times weekly for roughly three months.[2] (Defs. 56.1 ¶ 13; Pl. 2d Dep. 51:7-52:10; Mun Aff. ¶ 3 (stating that Mun recommended that

---

[2] The parties did not produce records relating to these visits.

Plaintiff receive treatment three times per week).) Thereafter, Plaintiff continued to receive these treatments, apparently at a lower frequency, until August 2015. (Pl. 2d Dep. at 68:9-22.) Plaintiff was not prescribed any medication or provided with a neck or back brace. (Defs. 56.1 ¶¶ 16-17; Pl. 2d Dep. 51:4-6; 62:8-11.) Plaintiff ceased this course of treatment in August 2015. (Defs. 56.1 ¶ 21.) In his deposition, Plaintiff stated that he stopped the treatment because he "didn't have much free time" and had "to go to work."[3] (Pl. 2d Dep. 68:23-67:6.)

In February 2016, Plaintiff resumed receiving physical therapy, acupuncture, and chiropractic treatment. (Pl. 2d Dep. 68:15-20.)

### 3. Treatment and Examination by Dr. Arden M. Kaisman

#### a. *Initial Visit and Surgical Procedures*

On March 24, 2015, Plaintiff underwent magnetic resonance imaging ("MRI") of his back. (MRI Reports.) Reports of those MRIs indicate that Plaintiff was suffering from several bulging disks in his cervical and lumbar spine. (Id. at 1-2.)

On March 31, 2015, Plaintiff visited Dr. Arden M. Kaisman ("Kaisman"), who reviewed the MRIs of Plaintiff's back and examined Plaintiffs' neck and back in person. (Pl. Aff. ¶ 4; Kaisman Aff. ¶ 4.) Kaisman concluded that Plaintiff's cervical and lumbar spine range of motion was reduced from normal ranges by between 15 and 30 degrees. (Kaisman Aff. ¶ 4.) Kaisman also concluded that the MRIs demonstrated herniated disks in Plaintiff's cervical spine and disc bulges in his lumbar spine, as well as myofascial pain syndrome, all of which Kaisman attributed to the Collision. (Id. ¶¶ 5-7.) Kaisman "discussed . . . surgical options to relieve

---

[3] In his affidavit submitted in connection with his opposition to this motion, Plaintiff states that his medical bills were paid "by what . . . are commonly referred to as 'no fault' benefits" and that he ceased receiving treatment only when his "no-fault benefits were denied" in August 2015. (Pl. Aff. ¶¶ 8-9.) However, Plaintiff does not point to any evidence in the record to support this assertion, which appears to contradict the statements in his deposition testimony that he stopped seeking treatment because he needed to return to work. Accordingly, the court does not credit these statements for purposes of the present motion. See Clayborne, 381 F. App'x at 35.

[Plaintiff's] neck pain, lower back pain and radiating pain to his shoulders and lower extremities." (Id. ¶ 8.)

On April 8, 2015, Kaisman performed a cervical discectomy on the C5 and C6 vertebrae in Plaintiff's cervical spine in an attempt to relieve his neck pain. (Id. ¶ 9; Pl. Aff. ¶ 7.) Plaintiff testified that this procedure reduced—but did not fully alleviate—both the intensity and frequency of the pain he experienced. (Pl. 2d Dep. 62:16-63:16.)

On March 9, 2016, Kaisman performed a second surgical procedure, an endoscopic lumbar discectomy, this time on Plaintiff's lower back. (Kaisman Aff. ¶ 10; Pl. 2d Dep. 64:6-20.) Plaintiff again testified that the procedure alleviated some, but not all, of his pain. (Pl. 2d Dep. 64:25-65:9.)

    *b. November 1, 2016, Testing*

On November 1, 2016, Kaisman performed objective range-of-motion testing on Plaintiff. (Kaisman Aff. ¶ 11.) Kaisman states that he did not take Plaintiff's subjective complaints of pain into account in conducting these measurements. (Id.) From this testing, Kaisman concluded that Plaintiff continued to experience a reduced range of motion in his cervical and lumbar spine, with reductions of 15 to 30 degrees in his cervical spine and 10 to 30 degrees in his lumbar spine. (Id. ¶ 12.) The physical examination also included a Straight Leg Raising Test, which was positive on the left side at 40 degrees. (Id.) In addition to this reduced motor function, Kaisman found that Plaintiff had decreased motor strength in his deltoid muscles and muscle spasms on the left side of both his lumbar and cervical spine. (Id.)

Based on this examination, Kaisman diagnosed Plaintiff with bulging and herniated disks with cervical radiculopathy and myofascial pain syndrome in his cervical spine, and bulging discs with lumbar radiculopathy and myofascial pain syndrome in his lumbar spine. (Id. ¶ 13.) Kaisman concluded that Plaintiff "is still under a chronic painful condition . . . in spite of

6

intensive treatment of chiropractic, acupuncture, and physical therapy" and gave his opinion that both the injuries and range of motion deficits are likely to be permanent. (Id. ¶¶ 14-15.)

### 4. Treatment by Dr. Benjamin Wu

Also following the Collision, Plaintiff visited his primary care physician, Dr. Benjamin Wu ("Wu") on eleven[4] separate occasions, starting on March 2, 2015, and going through April 11, 2016. (Wu Records; see also Pl. 2d Dep. 27:20-28:17.) Records from those visits do not reflect any mention of the Collision, and Plaintiff testified that he did not tell Wu about the accident. (Pl. 2d Dep. 30:7-12.) However, on May 4, 2015, Plaintiff requested and obtained a "waist brace for work for heavy lifting." (Id. at ECF p.4; see also Pl. 2d Dep. 66:6-67:12.)

### 5. Independent Medical Examination by Dr. Nicholas H. Post

On July 22, 2016, Plaintiff was evaluated by independent medical expert Dr. Nicholas H. Post ("Post"), who produced a report of this examination (the "IME Report"). (IME Report.)

Post conducted a physical examination of Plaintiff. Among his observations, Post found that Plaintiff's cervical and lumbar spine were non-tender and did not demonstrate muscle spasms. (Id. at 3-4.) Post also measured Plaintiff's range of motion using unspecified tests and found no deviation from normal ranges in either his cervical or lumbar spine. (Id.) From these and other observations, Post concluded that there was no "objective evidence of deficits on physical examination." (Id. at 7.) Moreover, based on his physical examination, interview with Plaintiff, and review of Plaintiff's post-Collision medical records, Post found that Plaintiff "does not exhibit any evidence of permanent or lasting disability" attributable to the Collision. (Id.)

---

[4] In Defendants' Rule 56.1 Statement, they assert that Plaintiff visited Wu "on more than a dozen different occasions after the date of the collision." (Def. 56.1 ¶ 24.) By the court's count, however, Wu's records show only 11 visits. (See Wu Records.)

7

At the time of his initial report, Post also reviewed MRI reports from the images taken on March 24, 2015, but stated that he was "unable to comment on their significance" or evaluate Kaisman's decision to perform surgery on Plaintiff without viewing the MRIs themselves. (Id. at 6.) However, an addendum to the report indicates that Post subsequently reviewed MRIs of Plaintiff's cervical and lumbar spine and states that "[b]ased off of the clinical and radiographic information available, there is no clear indication for discectomy surgery." (Id. at 8.)

6. Plaintiff's Pre- and Post-Collision Work History

Prior to the Collision, Plaintiff was employed by a restaurant, where he performed unspecified "errands" and worked five-to-six days weekly for eight hours each day. (Pl. 1st Dep. 13:5-22; 15:9-13; 21:4-10.)

Following his February 24, 2015, examination of Plaintiff, Mun "instructed [Plaintiff] to avoid strenuous activities including vocational duties" and "made a written prescription and advised [Plaintiff] that he should be recognized as disabled from the date of the examination . . . to May 28, 2015, with the possibility of extension." (Mun Aff. ¶ 4; id. at ECF p.8.) Plaintiff testified that he did not resume working until August 2015, roughly six months after the Collision. (Pl. 2d Dep. 21:11-14; Defs. 56.1 ¶ 21.)

When he resumed working at the restaurant, Plaintiff's work schedule was reduced to two days per week for eight hours each. (Pl. 1st Dep. 15:20-16:2.) Plaintiff testified that this reduction in his workload was due to his inability to perform "heavy labor work." (Id. 21:17-19.) Plaintiff ceased his employment in late February 2016, prior to (and because of) his second surgical procedure. (Pl. 2d. Dep. 8:20-9:9.) In roughly April or May 2016, Plaintiff

began working for a new restaurant, where he worked four days weekly for eight hours per day.[5] (Pl. 2d Dep. 6:13-24.)

Plaintiff testified that, since the Collision, he has been unable to participate in certain recreational activities and domestic activities, including playing basketball, bowling, cleaning the house, mopping, doing laundry, and moving "heavy items."[6] (Pl. 2d Dep. 79:12-81:14.)

### 7. Assault Against Plaintiff in December 2015

Separate from the Collision, Plaintiff was also the victim of a violent robbery and assault in December 2015. (Pl. 2d Dep. 34:14-41:5; Defs. 56.1 ¶ 23.) During that incident, Plaintiff was struck in the face by the assailants. (Pl. 2d Dep. 35:14-23.) The day after this assault, Plaintiff was examined by Wu, who diagnosed him with a contusion of his left eyeball, orbital tissues, and left eye. (Wu Records at ECF pp.14-15; see also Pl. 2d Dep. 72:24-73:20.)

### C. Procedural History

Plaintiff filed the present action in the Supreme Court of the State of New York for Kings County on June 25, 2015. (Compl. (Dkt. 6).) Defendants removed the action to the Eastern District of New York on July 27, 2015, at which point it was assigned to Judge John Gleeson. (Not. of Removal (Dkt. 1).) On March 11, 2016, the case was reassigned to the undersigned. (Mar. 11, 2016, Reassignment Order.)

Plaintiff's sole claim is that his injuries resulting from the Collision caused him to suffer a "serious injury" as defined by New York State's "No-Fault" insurance law, New York

---

[5] The IME Report notes that Plaintiff was working as a livery driver at the time of that examination. (IME Report at 7.) This information does not appear elsewhere in the record and is not mentioned by the parties.

[6] Plaintiff identified a package of 24 water bottles as an example of a "heavy item." (Pl. 2d Dep. 81:5-14.)

Insurance Law Section 5104, and that he is entitled to recover from Defendants for non-economic losses as a result.[7] (Compl. ¶¶ 27-31.)

## II. DISCUSSION

Currently before the court is Defendants' motion for summary judgment. (Mot.) Defendants contend that the facts of Plaintiff's activities and treatment subsequent to the Collision demonstrate that he has not suffered a "serious injury" covered by New York insurance law and so is not entitled to any recovery from Defendants. (Defs. Mem. in Supp. of Mot. ("Defs. Mem.") (Dkt. 26-3).) The court finds otherwise and denies the Motion accordingly.

### A. Legal Standard

A court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." Figueroa v. Mazza, 825 F.3d 89, 98 (2d Cir. 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The movant may discharge this burden by showing that the non-moving party has 'fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., 255 F. Supp. 3d 443, 451 (S.D.N.Y. Apr. 28, 2015) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

---

[7] In the Complaint, Plaintiff also states that he sustained "economic loss greater than the basic economic loss as defined by § 5104 of the Insurance Law of the State of New York." Under that section, "basic economic loss" includes expenses up to $50,000 incurred as a result of a motor vehicle for medical care, loss of earnings, and other necessary expenses, exclusive of pain and suffering or similar forms of tort damages. N.Y. Ins. Law § 5102(a). Plaintiff does not appear to pursue any claim that he suffered economic losses in excess of $50,000, however, and so the court does not address that point here.

10

"In determining whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" SCW West LLC v. Westport Ins. Corp., 856 F. Supp. 2d 514, 521 (S.D.N.Y. 2012) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)). "[T]he judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 249). However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

### B. "No-Fault" Insurance

The right to recover for non-economic losses sustained as a result of negligent use or operation of an automobile under New York law is controlled by Article 51 of the state's Insurance Law. In relevant part, that statute states that:

> Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for <u>non-economic loss, except in the case of a serious injury,</u> or for basic economic loss.

N.Y. Ins. Law § 5104(a) (emphasis added). The No-Fault insurance law thus limits the circumstances under which parties injured by automobile accidents are entitled to recover in tort for "non-economic" damages, requiring any individual claiming such damages to show that they suffered a "serious injury." See, e.g., Williams v. United States, 597 F. App'x 647, 648

(2d Cir. 2015) (summary order). The statute defines "serious injury" to include a personal injury which results in:

> (1) Death;
>
> (2) Dismemberment;
>
> (3) Significant disfigurement;
>
> (4) A fracture;
>
> (5) Loss of a fetus;
>
> (6) Permanent loss of use of a body organ, member, function, or system;
>
> (7) Permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system;
>
> (8) Significant limitation of use of a body function or system; or
>
> (9) A medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment [(the "90/180 Rule")].

N.Y. Ins. Law § 5102(d).

Where the particular accident in question is covered by the no-fault scheme and non-economic damages are sought, the "court should decide the threshold question of whether the evidence would warrant a jury finding that the injury qualifies as a 'serious injury.'" Yong Qin Luo v. Mikei, 625 F.3d 772, 776-77 (2d Cir. 2010) (per curiam) (citing Licari v. Elliot, 441 N.E.2d 1088 (1982)). "[S]ubjective complaints alone are not sufficient for a finding of serious injury, and [] objective evidence is needed." Gualtieri v. Farina, 283 F. Supp. 2d 917, 921 (S.D.N.Y. 2003) (citing Toure v. Avis Rent A Car Sys., Inc., 774 N.E.2d 1197 (2002)).

A defendant moving for summary judgment against a plaintiff claiming "serious injury" is required to establish a prima facie case that no such injury was sustained. Yong Qin Luo, 625

12

F.3d at 777. In doing so, "defendant may rely on the unsworn reports by plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits." Id. (quoting Barth v. Harris, No. 00-CV-1658, 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001)). If the defendant meets its burden, the plaintiff is required to make a prima facie showing that it in fact suffered a serious injury, which must be supported by "admissible evidence . . . in the form of sworn affidavits by physicians," id. (quoting Barth, 2001 WL 736802, at *2), as well as any unsworn reports on which the defendant relied in its motion, Gualtieri, 283 F. Supp. 2d at 922 (collecting cases).[8]

### C. Application

Plaintiff claims that the injuries he suffered in the Collision satisfy four of the categories of "serious injury" listed above: (1) permanent loss of use of a body organ, member, function, or system; (2) permanent consequential limitation of use of a body organ or member; (3) significant limitation of use of a body function or system; and (4) the "90/180 Rule." (Pl. Opp'n to Mot. (Dkt. 26-14) at 7-22.) After examining the Motion, the court concludes that Defendants have not met their burden of making out a prima facie case with respect to any of the categories of "serious injury" that Plaintiff claims to have suffered, while Plaintiff has presented sufficient objective evidence to conclude he has in fact suffered a qualifying "serious injury."

---

[8] The court notes the tension between this burden-shifting scheme and the standard generally applicable to motions for summary judgment in federal court, which permits a defendant to prevail on its motion where it demonstrates that a plaintiff has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. However, given the Second Circuit's explicit adoption of the New York burden-shifting scheme in Yong Qin Luo, as described above, the court concludes that it must do so as well. See Perpall v. Pavetek Corp., No. 12-CV-336 (PKC), 2017 WL 1155764, at *12 n.27 (E.D.N.Y. Mar. 27, 2017). Moreover, as described in greater detail below, the court concludes that Plaintiff has placed sufficient evidence in the record to raise a triable issue as to whether he suffered a "serious injury" under New York law, such that he would survive summary judgment even under the Celotex standard.

With respect to the first three categories of "serious injury" Plaintiff claims to have suffered—constituting a permanent or significant loss or limitation of a body member or function—Defendant's opposition centers on the IME Report and its conclusions that Plaintiff enjoyed a full range of motion in his cervical and lumber spine and did not exhibit any evidence of physical deficits or lasting disability. (IME Report at 7; Defs. Mot. at 9.) That report provides no insight into the objective tests relied upon by Post to arrive at this determination, however, instead simply listing the measured and normal ranges of motion. (IME Report at 3-4.) New York courts have repeatedly held that reports which fail to specify the tests forming the basis for their range-of-motion determination are insufficient to satisfy the defendant's prima facie burden. See, e.g., Kavanagh v. Singh, 826 N.Y.S.2d 97, 98 (N.Y. App. Div. 2006) ("[W]hile [the defendant's expert] also found in his report that the plaintiff had 'full' range of motion of the neck upon examination, he failed to set forth the objective testing performed to arrive at that conclusion."); Faun Thai v. Butt, 824 N.Y.S.2d 131, 132 (N.Y. App. Div. 2006) (noting that the defendants' experts "failed to set forth the objective test or tests performed" to support their conclusion that the plaintiff had "normal" or "full" range of motion, and holding that "[o]n this finding alone, the defendants failed to meet their initial prima facia burden"). Stripped of support from the IME Report, Defendants offer no alternate basis for their contention, instead arguing only that Plaintiff has not presented any medical evidence to suggest that his injuries are "permanent[,] consequential" or constitute a "significant limitation." (Defs. Mem. at 8.) In the absence of objective evidence sufficient to support a prima facie case that no "significant injury" occurred, however, the court is not required to address the sufficiency of Plaintiff's contrary showing. See, e.g., Ilardo v. N.Y.C. Transit Auth., 814 N.Y.S.2d 201, 202 (N.Y. App.

Div. 2006) ("Since the defendants failed to establish their prima facie entitlement to judgment as a matter of law, we need not address the sufficiency of the appellant's opposition papers.").

Moreover, even were the court to conclude that Defendants had in fact established a prima facie case that no permanent or substantial loss or limitation exists, Plaintiff's proffered medical evidence is sufficient to make out his own required showing. In particular, Kaisman provides his own assessment that Plaintiff's range of motion in his cervical and lumbar spine remain well below normal measurements as determined by objective testing,[9] that Plaintiff "is still under a chronic painful condition," and that these limitations are likely to be permanent. (Kaisman Aff. ¶¶ 12-16.) These findings and conclusions directly contradict the IME Report and are sufficient to provide the "objective proof of injury" needed to advance a prima facie showing of "serious injury" based on permanent or substantial limitation or loss of function. See, e.g., Toure, 774 N.E.2d at 1201-02 (concluding that a report describing the qualitative nature of the plaintiff's lost range of motion, backed by objective findings and comparison to normal function, raised a material issue of fact as to both the permanent consequential and significant limitation categories of "serious injury"); Cowley v. Crocker, 589 N.Y.S.2d 119, 120-21 (N.Y. App. Div. 1992) (finding that evidence of "specific loss of range of motion . . . and [] the permanent nature of the loss" was sufficient to establish "permanent loss of use of a body function or system").

Likewise, Defendants fail to make a prima facie showing that Plaintiff cannot show a "serious injury" under the 90/180 Rule. Defendants again primarily rely on Plaintiff's alleged failure to present evidence that he was restricted in his activities for the requisite 90 days, and the

---

[9] Unlike the IME Report, Kaisman sets forth at least one test that he relied on in coming to his decision, the Straight Leg Raising test. (Kaisman Aff. ¶¶ 4, 12.)

15

only affirmative evidence to which Defendants point to back up the contrary claim is Plaintiff's request to Wu for a back brace for "heavy lifting" on the 80th day after the Collision. (Defs. Mem. at 9-10.) This request for a back brace is insufficient to indicate that Plaintiff was in fact <u>engaged</u> in heavy lifting during the designated period, however, and certainly does not suffice to make out a prima facie case that Plaintiff was able to engage in his usual and customary activities. Moreover, contrary to Defendants' suggestion, Plaintiff's medical records and other evidence from the time of the Collision demonstrate that his "usual activities were curtailed 'to a great extent rather than some slight curtailment.'" Zavialov v. Morgan, No. 96-CV-5705 (JG), 2000 WL 133846, at *3 (E.D.N.Y. Jan. 13, 2000) (quoting Licari, 441 N.E.2d at 1091). This includes evidence that Plaintiff (1) "had difficulty with activities of daily life, including standing, sitting, walking, going up and down stairs, bending, lifting, and carrying" (Mun Initial Report at ECF p.1); (2) was directed to limit his activities, including his vocational duties, for at least the period from February 24 through May 28, 2015 (Mun Aff. at ECF p.8); and (3) did not work until August 2015 (Pl. 2d Dep. 21:11-14; Defs. 56.1 ¶ 21). Regardless of whether Defendants' claims could form the basis for a prima facie case, these facts in the record are more than sufficient to satisfy Plaintiff's burden.

Defendants last argue—in passing—that even if Plaintiff does suffer from a "serious injury," his claim against Defendants should be dismissed because "additional contributory factors" may have interrupted the chain of causation between the Collision and his injuries. (Defs. Mem. at 10.) The only potential "intervening factor" suggested by Defendants is the six-

month gap in Plaintiff's treatment between August 2015 and February 2016.[10] (Id.) They do not, however, suggest how this gap could have contributed to Plaintiff's injuries, nor is any such explanation evident to the court. As with the question of whether a "serious injury" occurred, Defendant bears the initial burden of making a prima facie case based on medical evidence that the injuries complained of are not causally linked to the accident in question. See, e.g., Perpall v. Pavetek Corp., No. 12-CV-336 (PKC), 2017 WL 1155764, at *12 (E.D.N.Y. Mar. 27, 2017) (citing Pommells v. Perez, 830 N.E.2d 278, 286 (N.Y. 2005)). Defendants have failed entirely to make this connection here.

Accordingly, the court concludes that Defendants have not demonstrated their entitlement to summary judgment and denies the Motion.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 26-1) is DENIED. The parties are directed to contact the chambers of Magistrate Judge James Orenstein to schedule the filing of a Joint Pretrial Order in accordance with this court's Individual Rules, to be electronically filed no later than February 16, 2018. The parties are further directed to confer and to contact the court's Deputy at 718-613-2545 to set a trial date.

SO ORDERED.

Dated: Brooklyn, New York
December 8, 2017

s/ Nicholas G.Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

---

[10] Defendants also state in their reply that "Plaintiff [] failed to address the injuries to his head that he sustained in an unrelated incident in December 2015." (Defs. Reply in Supp. of Mot. (Dkt. 26-18) at 7.) They do not, however, suggest that the December 2015 assault on Plaintiff is in some way linked to the injuries complained of here, nor is any connection between the injuries sustained in that attack—all of which appear to have been to Plaintiff's eye (Wu Records at ECF pp.14-15)—and those which form the basis for his claims apparent to the court.